In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-01-206 CR


____________________



WILLIAM NYLES THRAILKILLE, Appellant



V.



THE STATE OF TEXAS, Appellee






On Appeal from the 260th District Court


Orange County, Texas


Trial Court Cause No. D 970110-R






O P I N I O N



 William Nyles Thrailkille appeals his conviction and 40-year sentence for murder. 
Tex. Pen. Code Ann. § 19.02 (Vernon 1994). The indictment charged Thrailkille with
"intentionally and knowingly caus[ing] the death of an individual, Misty Goza, by shooting
[her] with a firearm. . . ." on or about February 7, 1992. Thrailkille contends the victim
committed suicide. He raises six issues on appeal: issue one challenges the factual
sufficiency of the evidence to support the conviction; issue two contends that Thrailkille
was denied effective assistance of counsel at trial; and issues three through six challenge
certain of the trial court's evidentiary rulings.Issue One--Factual Sufficiency of the Evidence

 In considering the factual sufficiency of the evidence, an appellate court views all
the evidence in a neutral light and sets aside the verdict only if it is so contrary to the
overwhelming weight of the evidence as to be clearly wrong and unjust. See Johnson v.
State, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000). An appellate court must employ
appropriate deference to prevent the substituting of its judgment for that of the fact finder,
and should not substantially intrude upon the fact finder's role as the sole judge of the
weight and credibility given to witness testimony. Id.

State's Evidence

 Vernon Wade Odom, an officer with the Orange County Sheriff's Department, 
responded on February 7, 1992, to a "possible suicide" death scene in Orange County,
Texas. He observed a deceased female lying on a bed on her back, with a shotgun across
the upper portion of her body. The decedent's left hand was around the muzzle of the gun
and there was a severe injury to the upper portion of the head from what appeared to be
a shotgun blast. After emergency personnel had removed the deceased's body, Odom
recovered a spent shotgun shell, or "hull," from under where the right hip of the body had
been laying. 

 Thrailkille accompanied Odom back to the sheriff's office. Odom conducted a trace
metal test on Thrailkille, which would indicate whether the person had contact with a metal
substance. The test results from Thrailkille were positive. Odom also conducted an
"atomic absorption" test on Thrailkille, which is used to detect gun powder residue. That
test was sent to the Department of Public Safety in Austin for analysis. Odom also
performed these same tests later on the hands of the decedent during the autopsy. He
testified that the trace metal test on the decedent returned a positive result. He performed
the atomic absorption test on the hands of the decedent, and forwarded the test to Austin
for analysis. 

 Deputy Johnny Westbrook was a captain with the Orange County Sheriff's
Department. Westbrook thought that some of the things the other officers were telling him
about the case "didn't sound right," so he ordered the officers to investigate further. 
Westbrook subsequently interviewed Thrailkille, and, after giving Miranda warnings, took
Thrailkille's written statement. In Thrailkille's written statement, read to the jury by
Westbrook, Thrailkille said that he and Misti had been arrested in Bridge City three or four
nights before. Thrailkille stated that he was released after making a deal with the police. 
He and Misti went to Chris Smith's house on the evening of February 6, 1992, arriving
about 7:30 p.m. They both left about 1:30 or 2:00 a.m. on the 7th, returning straight to
Thrailkille's house. He stated that he and Misti argued over their displays of affection for
other parties. When Thrailkille mentioned Misti's ex-boyfriend Matt, she grabbed her
keys and ran out the door. He heard squealing tires as she left. She returned a few
minutes later, soaking wet from the waist down, telling Thrailkille that she had wrecked
her car. Thrailkille got dressed, and went outside to retrieve the car. He found the car
in a pool of water, but was not able to get it started. When he came back inside he saw
Misti with a knife in her hand, which he took away from her and threw outside. He stated
that she attempted to drink some kind of liquid from a bottle she got from the washroom. 
He took that away from her. When he came back to his room, she had taken his shotgun
from the rack, and was attempting to load it. He took the gun away from her and put it
back on the rack. Misti got the gun again, but did not load it. He stated that the two of
them both had hold of the weapon, wrestling over it. He thought he had settled her down,
and he then took the gun and put it back on the rack. He said he was going upstairs to call
a wrecker for her car. Before he got up the stairs, he heard the gun go off. When he went
back downstairs, he "could see that half of her head was gone." He then went upstairs,
where his mother, his little brother, and her boyfriend were, and called 9-1-1. After
Thrailkille's mother asked him if his marijuana paraphernalia was in his room, he went
downstairs, retrieved the items, and threw them in the river. 

 Juan Antonio Rojas, a chemist employed by the Texas Department of Public Safety
Crime Lab in Austin, performed analysis on the two atomic absorption test kits. No
residue was detected from the test performed on Thrailkille. He testified that use of water
or cleaning of the hands could have removed all traces of the residue. The left palm of the
deceased tested positive. A positive result means that: 1) the person fired the weapon; 2)
the person was close to a weapon as it was being fired; 3) the person may have handled
a weapon that was recently fired. 

 Ladina Aven was a 9-1-1 dispatcher for Orange County in 1992. In the early
morning hours of February 7, 1992, she received a 9-1-1 call reporting a suicide. She
remembered the caller as not seeming to be upset, but admitted to not knowing Thrailkille
and being unaware of how he would act under pressure. 

 Gary Scott was employed with the criminal investigation division of the Orange
County Sheriff's Department. He originally got the call to the scene as a suicide. He
observed the deceased lying on a bed in the bedroom "with the upper portion of her head
gone." Scott also spoke to Thrailkille, who stated that he and Misti had an argument, that
Misti had picked up a knife and tried to cut her wrists and that he took the knife away from
her and threw it into the woods. Thrailkille also told Scott that Misti had picked up a
shotgun and loaded one shell into it, and that he had taken the gun away from her and put
it back on a rack. Thrailkille said that Misti had left in her car, but returned a few minutes
later stating that she had wrecked the car. Thrailkille stated that he went out to try to
retrieve her vehicle. When the car wouldn't start, he returned to the house. He left Misti
standing in the bedroom when he went upstairs to call a wrecker. Then he heard the
shotgun blast. 

 Scott was able to locate Misti's car, which appeared to have been in an accident, in
a flooded area about 50 yards from the residence. Scott subsequently returned to the
scene, where he observed clothing in the washing machine and on the floor. He
investigated the pattern left by the pellets from the gun. He was able to recover a knife
from the area in which Thrailkille said he had thrown it. 

 Linnes Hubbard held the rank of major with the Orange County Sheriff's
Department, handling criminal investigations at the time of the incident. He has many
hours of formal training in criminal investigations, and has testified as an expert witness
on many occasions. The next morning, investigating officers contacted him by telephone
regarding the death of Misti Goza. After examining photographs of the death scene he
concluded that, based upon the positioning of the body, the disarray of the clothing, and
the positioning of the shotgun, it would have been impossible for decedent to have pulled
the trigger herself, completely demolishing her brain, and still have the motor movement
to move the hand to the position shown on the picture. Hubbard testified that, based upon
his experience, females desiring to commit suicide with a weapon do not generally shoot
themselves in the head. He also testified that the firing of a shotgun like the one shown
will normally cause the weapon to jump backward from recoil, as much as 6 to 8 feet. He
reviewed the reports, received Thrailkille's statement several days after the incident, and
then he spoke to Thrailkille. Thrailkille told Hubbard that he and Misti did not have an
argument, but they had discussed Misti's alleged sleeping with her ex-boyfriend Matt. 
Thrailkille told Hubbard that he left the house to try to get Misti's car started, but could
not do so, and that he returned to the house to call a wrecker. He said that Misti got a
knife and tried to kill herself and that he took the knife from her and threw it outside. 
Thrailkille told Hubbard that Misti obtained a gun, he attempted to take the gun away
from her, they wrestled over the shotgun on the bed, and he took the gun away from her. 
He put it back on the rack before going upstairs to call the wrecker, and then he heard the
gunshot. He returned downstairs, saw Misti, and called 9-1-1. Thrailkille told Hubbard
that the only thing he moved at the scene before police arrived was some drug
paraphernalia from under the bed. He said that Misti's clothing was wet due to the
location where her car stalled. He said he and Misti were intoxicated. 

 In his testimony, Hubbard pointed to the following evidence:

 There was not much distance to travel leaving the lower room of the house
for the stairway that lead to the top floor, and, if the gun was back on the
gun rack as Thrailkille said, it would take an experienced person at least 15
seconds to load the gun; 


 The positioning of the shell casing they found underneath Misti meant that
someone would have had to be on top of her when the shotgun was fired to
allow the cartridge to fall under her where it was found;


 The recoil that would occur due to the firing of the weapon would not have
left Misti's hand on the barrel of the gun, as depicted in the pictures; and 

 

 The targeting of the shotgun blast indicated that Misti's head was up and not
completely on the bed when the gun was fired. 


 On cross-examination, Hubbard testified that he was not aware of published articles
which disagreed with his belief that women do not generally shoot themselves in the head
to commit suicide, and he still held to his belief based upon his own experience. He
acknowledged that some of Misti's actions were consistent with suicidal behavior.

 Steve Mardis was at the time of trial a lieutenant in the narcotics division of the
Orange County Sheriff's Department. In February of 1992, he was an officer in Bridge
City. On the evening of February 4, 1992, he spoke to Misti, who had been arrested, 
about becoming a drug informant. Misti told him she would think about it and get back
to him. Mardis testified that Misti told him at that time she did not want to go home with
her boyfriend, Thrailkille, and asked Mardis to take her home, which he did.

 Claude Wimberly was a justice of the peace in Orange County. His official duties
included going to the scene of a death, preparation of the death certificate and conducting
an inquest. He identified Misti from her driver's license at the scene. He was told by
Thrailkille at the scene that Misti's death was the result of suicide, and that he and Misti
had an argument just before she shot herself. When Judge Wimberly talked to Thrailkille,
it appeared that Thrailkille had just come out of the shower, because his shoulder-length
hair was wet and he may have been barefoot. The judge made a report of the inquest,
which indicated the cause of death as a shotgun blast to the head. He testified he did have
some reservations about Thrailkille's explanation and so informed the investigating
officers.

 Mathew Brian Johnson considered Misti to be his wife. They first started dating
when he was 16 and she was 14, and lived together. They were together for four years,
although they did not always live under the same roof. Johnson testified as to several
incidents of Misti's suicidal behavior during their relationship, such as overdoses of
medication and cuts on her wrists. Johnson testified that he did not regard these as
"serious" attempts at suicide. In the period several days before Misti's death, Johnson
testified that he and Misti had been discussing a future together, even selecting a place
where they might live, pursuit of future careers, the giving of a ring by Johnson and the
ending of other relationships. He related that days before her death, Misti told him her
sister had just had a baby. Mathew was going to take his microwave oven to her so that
she could heat up the baby's formula. That was the last time he talked to Misti. 

 Elgin Royce Cole was an acquaintance of Thrailkille for 20 years; they were close
friends at one time, but not as close in later years. In February of 1992, Thrailkille asked
Cole to meet him, and they took a boat ride together. Thrailkille told him about Misti's
suicide and mentioned her previous suicide attempts. Four or five years later, Thrailkille
and Cole were on another boat ride, accompanied by James Wedgeworth. Cole testified
that he heard Thrailkille tell Wedgeworth the law would never be able to prove anything
against him:

 A. Well, James [Wedgeworth] was questioning him about the girl and all and
what happened and they were talking about all different things about the law
and, you know, everybody was pretty much in agreement saying, you know,
to hell with the law and this and that.


 Q. [By the prosecutor] Yes, sir.

 A. And then he ended up stating that they wouldn't-the law would never be
able to prove anything on nothing because, you know, they were just
dumbasses or whatever. Sorry.


 Q. Okay. Now, as far as the substance of your conversation with them -
with him about this, was that the last conversation you had with him about
this event, the death of Misti Goza?


 A. Well, yes. I don't ask him about it the times when I see him. Even that
day James had - was the one questioning him. I was just listening to them
talk.


 Q. Yes, sir.


 A. And that's when the sentence was said, you know, that they'll never be
able to prove anything.


 James Wendell Wedgeworth recalled riding on a boat with Cole and Thrailkille,
and hearing Thrailkille tell him first about the incident with Misti, describing a supposed
suicide. When pressed, however, Thrailkille told them that he had done it, but they (the
law) would never be able to prove it. 

 Q. [By prosecutor] Okay. And did you have a conversation with Billy
Thrailkille about the death of Misti Goza?


 A. We was talking about that in general, yeah.


 Q. Okay. And, specifically, did you speak with him about how she died,
whether it was a suicide, not a suicide, if he was involved or not?

 

 A. Well, he had told me about the incident, fighting - they fought; he went
- she went down the road; come back momentarily; a car in a ditch or a flat
tire, one or the other, something; and she had come back; and they talked a
little bit more; and he went upstairs; and, boom, that happened.

 

 Q. Yes, sir.


 A. And we was talking about that and something to the effect of - I was like
"No, you know, this is me and Royce. You know, what's up?" I think
finally I said, you know, "Did you do it?"


 And he said, "Yeah, but they'll never be able to prove it." 

 

They were drinking beer and smoking marijuana at the time of the conversation. 

 Oscar Griffin, M.D. served as the coroner for Orange County and performed the
autopsy on Misti Goza in 1992. He noted that a shotgun blast had virtually destroyed
decedent's head. He noted that Misti had been intoxicated at the time of her death. He
ran a drug screen, and found that she had recently ingested marijuana, although not
necessarily right before her death. He prepared an autopsy report. He described the
wound as a "contact wound" because the skin had been blown out from it and there were
powder burns around the edges of the wound. He also described a "U-shaped" defect on
the right side of the head, consistent with the round barrel of a gun. He determined that
the gun had not been pressed perfectly against the skin, but at some angle, explaining the
"U" shape rather than an "O" shape. The entrance wound was on the right side, in the
right temple area. The blast went from right to left, slightly from frontwards to
backwards, and slightly downward to upwards. Dr. Griffin testified, to a reasonable
medical certainty, when viewing the photographs taken of the death scene showing Misti's
hand over the gun barrel, that the hand could not have ended at that location had the
decedent killed herself. After the brain is destroyed, all muscles go limp. He testified
that the hand would not have ended up in that position due to a cadaveric spasm, i.e., a
spasm that occurs at the time of death. He testified that his findings would indicate that
the butt of the shotgun would have been lower than the barrel. He acknowledged that
recoil from the gun shot could have moved the hand. 

Defense Evidence

 James Benjamin Riley was a friend of Thrailkille and Misti. He knew Misti for
about three months and he saw her about 5 times a week during that time. Misti went
through "mood swings," was familiar with guns, and used drugs and alcohol. 

 Christopher Smith had been a friend of Thrailkille for 7 - 8 years in 1992, and had
known Misti three or four months. He described the relationship between Thrailkille and
Misti as close, but they were free to see other people. He described Misti's moods as
going up and down. There was a party on February 6, 1992, at his residence; he testified
that Thrailkille and Misti, James Riley, Leslie McIntosh, and Jeff Dugas were there. They
were drinking, playing pool, listening to music, and smoking marijuana. Smith had a
conversation with Misti that night. He testified that she was depressed, and he observed
scars on her wrists. Misti informed him of past attempts at suicide. Smith testified that
he and Misti discussed whether there was a God, and that Misti gave him a pewter pendant
necklace which he had previously seen her wearing. Smith considered that to be
significant. He testified that Misti asked him to shoot her. He stated that Misti was
familiar with guns, and that she carried one in her purse. On the night of the party, late
in the evening on February 6 and early in the morning of February 7, Misti and Thrailkille
left his house between midnight and 1:00 a.m., or even possibly later. Smith got a call
from Thrailkille that evening and went over to Thrailkille's house. He did not see
Thrailkille take a shower that night, and described his hair as dirty or oily. Smith was not
aware that Misti was afraid of firearms or that her mother had died as a result of a firearm. 
He was not aware that Misti had some money, or that she liked to give things to people. 
Smith admitted that some of his testimony -- about Misti's request that he shoot her and
about the necklace -- was not in his original statements to police. 

 Roger Carl Hudson was Thrailkille's great-uncle. He cleaned up the room where
the shooting occurred after the police had completed their investigation. He found articles
of women's clothing in the room. He testified that the distance from the threshold of
Thrailkille's room to the stairway leading to the upper floor of the house was 10 - 15 feet. 

 Leslie Dugas, had known Thrailkille about three years, and Misti about three
months, at the time of the incident. She was present at the gathering at Chris Smith's
house prior to the incident. She stayed there about three hours, and she confirmed people
there were drinking, shooting pool, and smoking marijuana, but she personally did not
smoke marijuana that night. Dugas testified that Misti attempted to give her a long-sleeve
black shirt Misti had been wearing. She described Misti's moods as being up and down,
but never "bounce-off-the walls" happy. She testified as to a previous occasion when she,
Jeff, Billy, and Misti were in a bar, and Misti suddenly ran out the door. Thrailkille
described her behavior at that time as "She's tripping." Misti had told her about previous
suicide attempts. 

 Curtis Edwin Willis testified as a clinical and forensic psychologist. He testified
as to the symptoms to look for in a suicide situation: medical or psychological problems,
situational issues such as broken relationships, past attempts at suicide, and an impulsive
personality. In response to a hypothetical question listing a history of cutting wrists, drug
overdose, asking someone to shoot her, giving away personal items, depression, and using
drugs and alcohol, he testified that such behavior was consistent with suicide. He was
aware of a 1992 study which showed that 25 out of 45 women who committed suicide did
so by shooting themselves in the head. Willis did not know the victim's name in this case,
and he acknowledged that unsuccessful suicide attempts are often cries for help rather than
serious attempts to take the person's life. 

 Paul B. Radelat, M.D. is a board-certified pathologist. He has performed several
thousand autopsies. He testified a contact wound as a result of a shot to the head with a
gun in the hand of the victim is consistent with suicide. Dr. Radelat concluded that the
following symptoms would be consistent with suicide: an overdose of Valium with a
suicide note, attempts to drink cleaning fluid and to cut her wrists one day before her
death, a state of intoxication and the presence of marijuana in her system at the time of her
death, previous giving away of personal belongings, questioning the existence of God and
questioning the hereafter, and asking a friend to shoot her. Radelat was asked to examine
photographs and to assume that a cadaveric spasm occurred. He acknowledged the
potential for change in his opinion. He neither performed an autopsy on Misti nor
discussed with Dr. Griffin the autopsy findings. He acknowledged that the symptoms and
findings he observed were also consistent with homicide. 

 Gloria Cole's testimony implied that James Wedgeworth's testimony implicating
Thrailkille was false, because Wedgeworth wanted to get back at Thrailkille for sleeping
with the woman who was now Wedgeworth's wife. 


State's Rebuttal

 Royce Cole testified on rebuttal that his testimony was truthful and that his wife,
Gloria Cole, was under psychiatric care. 

Review


 Because Thrailkille has not raised a legal sufficiency challenge, we begin our review
with the presumption that the evidence is legally sufficient to support the verdict under
Jackson v. Virginia, 443 U.S. 307, 99 S. Ct. 2781, 61 L.Ed.2d 560 (1979). See Conner
v. State, 67 S.W.3d 192, 198 (Tex. Crim. App. 2001). The evidence is factually
insufficient if the evidence supporting guilt is so obviously weak as to render the
conviction clearly wrong and unjust, or, although adequate when taken alone, is so greatly
outweighed by the overwhelming weight of contrary evidence as to render the conviction
clearly wrong and unjust. See Vasquez v. State, 67 S.W.3d 229, 236 (Tex. Crim. App.
2002). 

 Some evidence was presented that Misti Goza's death was a suicide; but we cannot
say that the jury verdict was so contrary to the overwhelming weight of the evidence as to
be clearly wrong and unjust. See Johnson v. State, 23 S.W.3d at 7. The jury was entitled
to believe testimony that the shotgun used in Misti's death could not have ended up in the
position shown in the photographs if she had fired the gun herself. The location of the
shell casing beneath the body, Thrailkille's taking of a shower subsequent to the shooting
to explain the negative results in the atomic absorption test, and the location of the skull
and brain fragments presented circumstantial evidence to support the verdict. Although
there was testimony of Misti's up and down moods and previous attempts at suicide, there
was also testimony that she and Matt Johnson were ready to get back together and that they
were making positive plans for the future. If the jury did not believe she committed
suicide, then they did not believe Thrailkille's statements. He was the only other person
present when the death occurred. Just a few days before her death, Misti told Bridge City
police that she may be willing to serve as an informant in a narcotics investigation. She
also told the investigating officer that she did not want Thrailkille to take her home. The
jury could reasonably believe Cole and Wedgeworth, who testified essentially that
Thrailkille admitted in their presence that he murdered Misti. An appellate court may not
unduly interfere with the fact finder's resolution of conflicts in the testimony or its
determination of the credibility of witness testimony. See Vasquez v. State, 67 S.W.3d at
236; Drost v. State, 47 S.W.3d 41, 45 (Tex. App.--El Paso 2001, pet. ref'd). Viewing
all of the evidence, and giving proper deference to the trier of fact, we overrule appellant's
issue one. Issue Two-Ineffective Assistance of Counsel

 In issue two, Thrailkille contends his trial counsel was ineffective. He claims his
attorney should have called as a witness Loretta Hoffpauir, Thrailkille's mother in the
guilt-innocence portion of the trial. In testimony at the hearing on the motion for new
trial, Ms. Hoffpauir testified that Thrailkille came into her bedroom in an excited state on
the night of Misti's death and told her Misti had killed herself. She further testified as to
certain facts regarding Thrailkille's condition that she observed that would lead her to
believe that he had not showered before the police arrived.

 The standard for testing claims of ineffective assistance of counsel is set out in
Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed2d 674 (1984). 
An appellant must show that his counsel's representation fell below the standard of
prevailing professional norms and there is a reasonable probability that, but for counsel's
deficiency, the result of the trial would have been different. Id.; Bone v. State, 77 S.W.3d
828, 833 (Tex. Crim. App. 2002). A reasonable probability is a probability sufficient to
undermine confidence in the outcome. Strickland, 466 U.S. at 694. Bone, 77 S.W.3d at
833. Any allegation of ineffectiveness must be firmly founded in the record. Thompson
v. State, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). Failure to make the required
showing of either deficient performance or sufficient prejudice defeats an ineffective
assistance claim. Id. 

 An appellate court begins with a presumption that counsel's conduct falls within a
wide range of reasonable representation. Strickland, 466 U.S. at 689. A fair assessment
of attorney performance requires that every effort be made to eliminate the distorting effect
of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to
evaluate the conduct from counsel's perspective at the time. Miniel v. State, 831 S.W.2d
310, 323 (Tex. Crim. App. 1992). Generally, counsel's strategic decision to not call a
witness will be questioned only if there is no plausible basis for failing to call the witness. 
Velasquez v. State, 941 S.W.2d 303, 310 (Tex. App.--Corpus Christi 1997, pet. ref'd). 
 Thrailkille cites Butler v. State, 716 S.W.2d 48 (Tex. Crim. App. 1986), in support
of his contention that trial counsel's failure to call Ms. Hoffpauir had no plausible basis,
and that her exculpatory testimony would have affected the outcome of this case. 
However, Butler involved multiple exculpatory witnesses who would have testified that the
defendant was not the killer. Counsel had not contacted some of them, and could offer no
conceivable trial strategy why he did not utilize their testimony at trial. Id. at 54 - 55. The
Butler court held that the standard of reasonably effective counsel had not been met and
remanded the case for a new trial. Id. at 57. Here, the issue of whether Thrailkille had
showered between the time of death may have been significant because his atomic
absorption test proved negative, and expert testimony indicated that the test could have
been affected by washing of the hands. The testimony of Chris Smith, already in evidence
was to the effect that Thrailkille had not showered because his hair was oily and dirty. 
The issue of suicide was presented through many witnesses, and through appellant's
statements. The trial counsel may have reasoned Ms. Hoffpauir's testimony was
duplicative and would not have been of such significance as to have affected the jury's
determination. Ms. Hoffpauir is defendant's mother. She testified at the motion for new
trial that she told her son to remove marijuana paraphernalia from the scene before the
police arrived. Under these circumstances trial counsel reasonably may have considered
her testimony to be more harmful than helpful. The record contains no explanation why
Ms. Hoffpauir was not called as a witness. Thrailkille failed to overcome the presumption
that counsel's not calling defendant's mother as a witness was a matter of reasonable trial
strategy. Issue two is overruled. 

Issue 3-Opinion Testimony as to the Means of Committing Suicide

 Thrailkille contends the trial court committed reversible error in admitting the
testimony of Linnes Hubbard that in his opinion women who commit suicide are unlikely
to do so by shooting themselves in the head. Hubbard is an experienced police officer and
criminal investigator. He was first made aware of the incident when officers contacted him
at his home the next morning. The investigating officers brought him pictures of the
scene. He acknowledged never having visited the crime scene in its original state. The
testimony at issue here was as follows:

 Q. . . . Now, you had said that - . . .you didn't like - - or you were looking
at that photo; and the placement of the gun troubled you - 


 A. Yes, sir.


 Q. - the shotgun?


 A. Yes, sir.


 Q. Why was it troubling to you specifically?


 A. Well, this gets back to the thing; but in my training and -


 [Defense counsel]: Excuse me.


 A. - in the results of a lot of things, the training and consulting with other 

 officers and everything, its - 


 [Defense counsel]: Excuse me, Your Honor. At this point in time.
I'm going to object unless he can show that he has the proper medical
background to be able to draw an opinion that he's attempting to do. There
has been no qualification of his expertise in the field of medicine to be able
to make that decision. 


 THE COURT: All right. Objection is overruled.


 Q. [By the prosecutor] You can answer the question, Mr. Hubbard.


 A. Okay. The - normally when a female commits suicide with a weapon,
it's - the wound is to the body.


 Q. Okay.


 A. Very, very seldom it's to the head. And reverse in a male situation.


 Q. Right.


 A. That troubled me.


 Q. Yes, sir.


On cross-examination, Hubbard testified that he was not aware of certain published articles
which concluded the contrary, and he stuck by his opinion.

 Thrailkille contends on appeal that Hubbard was not sufficiently qualified as an
expert to render this opinion; that Hubbard's "opinion" was as to the guilt or innocence
of the accused; that the testimony improperly allowed Hubbard to interpret the meaning
of conduct or of another; and, that Hubbard's "expert" testimony did not meet the
threshold standards of admissibility as set forth in Daubert v. Merrell Dow
Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed2d 469 (1993). The State
contends that defendant failed to properly object with sufficient specificity to make the trial
court aware of the complaint he now asserts on appeal. The objection raised at trial was
that Hubbard was not qualified in the field of medicine. The State also contends that the
testimony was properly admitted by the trial court under recognized rules of law. 

 To preserve error, a defendant must lodge a timely and specific objection. The
purpose of requiring an objection is to give the trial court or opposing party the
opportunity to correct the error or remove the basis for the objection. If a timely and
specific objection is not made, error is not preserved. Martinez v. State, 22 S.W.3d 504,
507 (Tex. Crim. App. 2000). The point of error on appeal must correspond to the
objection raised at trial. Pina v. State, 38 S.W.3d 730, 736 (Tex. App.--Texarkana 2001,
pet. ref'd).

 Defendant's objection at trial did not question Hubbard's qualifications as a criminal
investigator or his experience with suicide victims. Hubbard based his opinion on his
training and experience as a criminal investigator. The objection made was not sufficiently
specific to inform the trial judge that the defense was objecting to Hubbard's expert
qualifications to express opinions based on his experience and training concerning suicides. 
The objection made at trial does not correspond to the issue raised on appeal. Issue three
is overruled.

Issue Four-Improperly Admitted Testimony

 In issue four, Thrailkille contends the trial court erred in admitting expert testimony
from Orange County Deputy Scott that decedent's body was "out of place," and
testimony regarding disbursement of blood. The record shows that Scott was an
experienced police officer and criminal investigator. Upon questioning by the prosecutor,
Scott testified, without objection, regarding his observations of what appeared to be skull
or brain matter on a chair in front of the bed, on the wall behind the decedent, and on the
bed itself. He testified, over an objection that he was not qualified to give medical
testimony, as to the location of the "blood and other matter." He was then shown a
photograph of the scene taken before he arrived and was asked, over objection that he had
not been sufficiently qualified as an expert in accident reconstruction, if the location of the
blood and other material at the scene was consistent with the gun being pointed in the
direction shown on the photograph. He responded "Yes."

 A police officer with relevant training or experience may qualify to give opinion
testimony. See Tex. R. Evid. 701 and 702. Thomas v. State, 916 S.W.2d 578, 580-81
(Tex. App.--San Antonio 1996, no pet.); Austin v. State, 794 S.W.2d 408, 410-11 (Tex.
App.--Austin 1990, pet. ref'd); Yohey v. State, 801 S.W.2d 232, 243 (Tex. App.--San
Antonio 1990, pet. ref'd). See also Ventroy v. State, 917 S.W.2d 419, 422 (Tex. App.--San Antonio 1996, pet. ref'd). Scott's testimony as to whether the positioning of the
material was consistent with the gun being pointed from a certain direction was within the
knowledge of an experienced police investigator. We find the reliability of Scott's
testimony to be sufficiently established. See generally Nenno v. State, 970 S.W.2d 549,
561 (Tex. 1998) (discussing questions to be asked in assessing reliability of expert
testimony based on experience and training). The trial court did not err in overruling the
defense objection. Issue four is overruled. 

Issues Five and Six--Alleged Erroneous Admission of Hearsay

 In issue five, Thrailkille argues the trial court erred in admitting hearsay testimony
of the victim, Misti Goza, as related by Lieutenant Steve Mardis of the Orange County
Sheriff's Department. On February 4, 1992, Mardis was employed by the Bridge City
police department. On that date, Misti was arrested and Mardis approached her about
possibly becoming a police informant. Misti told Mardis she would have to think about
it and get back to him. Mardis testified, over hearsay objection, that she did not want
Thrailkille to take her home, and asked Mardis to do so. He did. At closing, the
prosecutor referred to this testimony as follows:

 Well, a few days before this offense - and remember the times are funny on
this because we're talking about day and night. On Tuesday the 4th they get
pulled over, get arrested in Bridge City. Remember that? And Misti talked
to Steve Mardis, and Steve Mardis testified to you that she was going to turn
over drug people. She was going to be an informant. Remember that? 
Very important. That happened on Tuesday. Well, that was late in the
evening. So, she got home. But what did she say before she went home? 
"I don't want Billy Thrailkille bringing me home." Any one of you have a
red flag that just went up in your head because it should? Think about this
in context. I'm telling you if you think through this evidence, inescapable
conclusion of guilt. "I don't want Billy Thrailkille." 


 A trial court's ruling on the admissibility of evidence is reviewed under an abuse
of discretion standard. An appellate court should not reverse an evidentiary ruling which
is within the zone of reasonable disagreement. Dorsey v. State, 24 S.W.3d 921, 928 (Tex.
App.-Beaumont 2000, no pet.). Rule 803(3) of the Rules of Evidence excepts from the
hearsay rule "[a] statement of the declarant's then existing state of mind, emotion,
sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain,
or bodily health), but not including a statement of memory or belief to prove the fact
remembered or believed unless it relates to the execution, revocation, identification, or
terms of declarant's will." The statement of the victim of a crime, related by another
person, expressing fear of the defendant, has been held to be admissible under Rule 803(3) 
as a statement of existing state of mind. Martinez v. State, 17 S.W.3d 677, 688 (Tex.
Crim. App. 2000); Dorsey v. State, 24 S.W.3d at 927-28; Anderson v. State, 15 S.W.3d
177, 185 (Tex. App.--Texarkana 2000, no pet.). The trial judge did not err in admitting
the testimony. Issue five is overruled. 

 In issue six, Thrailkille claims error by the trial court in admitting testimony that
Misti informed her ex-boyfriend, Mathew Johnson, that her relationship with Thrailkille
was over. Under Rule 803(3) of the Rules of Evidence, statements of the intent of the
declarant with regard to relations have been held to be admissible as showing future intent,
and also admissible to demonstrate state of mind. Dorsey v. State, 24 S.W.3d at 928,
(testimony that victim not getting along with husband/defendant, and victim had been
seeking divorce); Vann v. State, 853 S.W.2d 243, 250 (Tex. App.--Corpus Christi 1993,
pet. ref'd)(testimony that the victim stated that he was not happy in his marriage and
wanted to find a way out was admissible as a statement of emotional state and intent to
act). The trial court did not err in overruling defense counsel's hearsay objection to
Johnson's testimony. Issue six is overruled.

 The judgment and sentence of the trial court are affirmed. 

 AFFIRMED.

 PER CURIAM 

Submitted on October 29, 2002

Opinion Delivered December 18, 2002

Do Not Publish


Before Walker, C.J., Burgess, and Gaultney, JJ.